**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CLARENCE YORK, | : | Civil Action No.: 13-7609 (JLL) |
|  | : |  |
| Petitioner, | : |  |
|  | : |  |
| v. | : | **OPINION** |
|  | : |  |
| STEPHEN O'LLIO, et al., | : |  |
|  | : |  |
| Respondents. | : |  |

**LINARES**, District Judge:

Currently before the Court is the petition for a writ of habeas corpus of Clarence York ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court conviction (ECF No. 1). The State has filed a response to the petition (ECF No. 12), to which Petitioner has replied (ECF No. 18). For the following reasons, this Court will deny the petition and will deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming Petitioner's conviction, the Superior Court of New Jersey – Appellate Division provided the following summary of the facts underlying this case:

> On July 19, 2003, at 10:48 p.m., Rahway Police Officers Ferrer and Seiden were dispatched to investigate a report of a dispute at Capobianco Plaza, a public housing development. Ferrer and Seiden proceeded to an apartment in Capobianco Plaza, where they met with Stacey York, who was nineteen years old at the time, and her fifteen-year-old sister, A.T., who had called in the dispute. The

young women lived with their mother, Carla T., sisters L.T. and M.T., and brother E.T. Stacey and A.T. told Ferrer that K.W. and some other "kids" were banging on their door and challenging them to a fight.   K.W. was thirteen years old and lived with her mother, Traniece, in Capobianco Plaza directly across the street from Carla and her family.

Ferrer then met with K.W., who claimed Carla's daughters had started the argument and the girls in the two families had been fighting since November 2002.   Ferrer and Seiden advised both parties of their rights and left without filing charges.

Meanwhile, Stacey called Carla, who was attending a family reunion in Newark, and told her about the incident with K.W.   Carla and her husband, Stacy T., who lived in East Orange, drove Carla's white Ford Explorer to a housing project in Newark, where they picked up [Petitioner], Anthony Jordan, and Jamal Peoples. [Petitioner] was Carla's brother and Jordan's uncle; Peoples was Jordan's cousin.   [Petitioner] was wearing a white shirt and gray or white pants.

[Petitioner], Jordan, and Peoples sat in the backseat of the Explorer. Jordan heard [Petitioner] say, "Somebody gonna get it"; he was "tired of this shit."   He also heard defendant say he had "his shank and he's ready to shank somebody."   Carla and Stacy also heard [Petitioner] mention his knife during the ride to Rahway. Carla saw "what looked like a pocketknife."   Stacy heard [Petitioner] say "[n]o one better f* *k with my nieces and nephews, and if someone does I'm going to f* *k them up.   If I got to shank someone I will. I don't give a f* *k."

At approximately 11:16 p.m., the Explorer pulled into the Capobianco Plaza parking lot just as Ferrer was leaving.   Carla and Stacy exited the vehicle and walked to Carla's apartment.   A few minutes later, the other three men, who had left the car for a bathroom stop, walked into Capobianco Plaza.

K.W., who was outside by a fence near Carla's apartment, heard Carla and Stacy call their daughters A.T., L.T., and Stacey, downstairs and tell them to "kill that bitch," while pointing at her. Monique, who was Traniece's sister, also heard Stacy tell A.T. to "come outside and kick [K.W.'s] ass."   Carla, however, said neighbors attacked her as soon as she left the Explorer, and Stacy

2

went to tell the girls to help "mommy." Stacy testified "[a]ll hell broke loose" after they left the car and he yelled for the girls to come downstairs because people were jumping on their mother.

At that point, A.T. jumped on K.W., knocked her down, and choked her. Other girls then joined in the fight. Monique and Carla began fighting, and later Monique saw Carla fighting Traniece. According to Stacy, the fighting involved only the women and girls. Jameel Swint, who lived across the street from Capobianco Plaza and was "like a brother" to K.W., went to help her. After Swint pulled A.T. off her, K.W. said a man placed his right foot on her chest. She testified in court the man resembled [Petitioner], except [Petitioner] looked older and had changed during the intervening three years, "[l]ike his facial hair and stuff, or like his weight." [Petitioner] told Swint to mind his business. Swint replied, "that is my business. That's my little sister." K.W. saw [Petitioner] "pull his hands from behind" and saw "a glare, like that, a metal piece, and [it] went right into [Swint's] stomach."

Manuel Johnson, who was at Capobianco Plaza that night visiting his girlfriend, testified he saw an individual wearing a white shirt and white pants, with his hair in "dreads," come out of a building and stab Swint. Johnson identified [Petitioner] in court as the person he saw stab Swint. Jordan heard Swint say, "You stabbed me" and "saw blood on his shirt, around his chest, and my Uncle [Clarence] by him with a knife in his hand." Stacey, on the other hand, saw [Petitioner] with a knife, but did not see him stab anyone.

Shantae Hill, who testified for the defense, saw a man with a knife that night and described him as "180, 195 pounds," wearing a white T-shirt with his hair in "short dreads" and a headband. Although she told police his face would "always stick in my mind," she was unable to identify him in two police photographic arrays or in court. On cross-examination, however, Hill acknowledged she was probably "10, 12, 15 feet" away from him at the scene and did not get a look at his full face during the confusion.

Stacy saw [Petitioner] "fist fighting" with another man and two minutes later he heard Jordan yell, "Hey pop, we gotta go. Okay?" [Petitioner] then said, "I shanked the mother f* *ker. We got to hurry up and get the f* *k out of here." Jordan asked Stacy for the keys to the Explorer, drove [Petitioner] and Peoples to Newark, and dropped the car at a commercial garage owned by

3

Clarence York, Sr., who was [Petitioner]'s father and Jordan's grandfather. Jordan told his grandfather about the fight and gave him the car keys.

After the stabbing, K.W. got up, saw "a lot of people around," and noticed a man—whom she later identified in a photo array as Jordan—standing nearby. She saw Jordan strike her mother Traniece with a metal baseball bat, after which someone else picked up the bat and hit her in the head. K.W. suffered a fractured skull and a laceration, which required stitches. While Monique was waiting for the ambulance to arrive, she saw a body lying on the ground, and recognized Swint with blood on his white T-shirt. She noticed the Explorer was gone.

At approximately 11:20 p.m., Ferrer received a second dispatch to return to Capobianco Plaza to investigate a disturbance. Upon arrival, he saw a crowd of approximately twenty-five people dispersing over the parking lot and into all areas of the apartment complex. Seiden was there, along with three or four other patrol cars. As Ferrer got out of his car, people ran towards him saying someone was hurt. He saw K.W. near her apartment, crying and bleeding from a gash on her forehead. Seiden stayed with K.W., and Ferrer went to investigate a report of a stabbing. Ferrer found a black male in his early twenties lying motionless on the ground with "a lot of blood on his shirt, and also on the grass underneath him." An ambulance transported Swint to the hospital, where he died. An autopsy determined that his death resulted from a stab wound to the chest and abdomen.

After receiving information about a vehicle of interest, Ferrer sent a radio dispatch to headquarters regarding a white Explorer with New Jersey license plate NWN–39B registered to Carla. Ferrer searched the area but did not find any weapon. The police also reviewed a video surveillance of the area, which showed the Explorer entering and leaving the Capobianco Plaza parking lot at the relevant time.

That evening, Sergeant Marcantonio was the on-call detective in the homicide unit of the Union County Prosecutor's Office when it received notification from the Rahway Police Department about the homicide. Marcantonio arrived at Capobianco Plaza at approximately 12:30 a.m. on the morning of

4

July 20, 2003, where he met Rahway Detective Stefanick. Marcantonio proceeded to interview witnesses at the scene.

The police arrested Stacy at the scene and later charged him with obstruction of justice. After his release the next morning, Stacy and Carla met [Petitioner] in Newark. Carla thought [Petitioner] was "shocked" and "looked like he was going to faint and throw up" after Stacy told him someone had died. Stacy related [Petitioner] said, "Oh shit, I didn't mean to do that, but they came at us." All three talked about what they would say to the police and agreed to tell them [Petitioner], Jordan, and Peoples were never at Capobianco Plaza that night.

At about 3:00 a.m. on July 20, 2003, Bernard Sasser and Anguel Knight asked Michael York for a ride home. York, who was [Petitioner's] nephew, got the Explorer from his grandfather's garage. At approximately 4:30 a.m., Officer Cockinos of the Elizabeth Police Department was operating a marked patrol unit when he received a radio transmission to look for a white Explorer heading south into Elizabeth from Newark. Cockinos observed the vehicle, with no occupants, parked in front of Hollywood Chicken, a fast-food restaurant. A black male, later identified as Knight, walked out of the restaurant towards the Explorer where Cockinos and his partner, Officer Leonard, detained him. A few seconds later, Sasser and York left the restaurant and were detained. The men were taken to Rahway police headquarters where Marcantonio and Stefanick took their statements. Knight said he heard [Petitioner] and Jordan talking about the fight when he and York picked up the Explorer, and heard [Petitioner] say he stabbed a "guy" and hoped he did not die.

Also on July 20, 2003, Stacy gave his first statement at the Rahway Police Department. Two days later, Carla gave her first statement to the police. They both told the police and the prosecutor's detectives that [Petitioner], Jordan, and Peoples were not in Rahway on the night of the fight.

On July 22, 2003, Jordan and York, Sr., went to the Roselle Police Department where Jordan offered to speak with officers. Rahway police officers drove Jordan from Roselle to the Prosecutor's Office where he met with Marcantonio and Stefanick. Before taking his statement, the detectives talked with him for a "little over an hour." Although Marcantonio and Stefanick did not

5

consider Jordan a suspect, they advised him of his [rights under *Miranda v. Arizona*, 384 U.S. 436 (1966),] prior to the interview because of his potential involvement.  After giving his statement, Jordan reviewed and signed it.   Also on July 22, 2003, Peoples gave a statement at the prosecutor's office.

On July 24, 2003, Marcantonio and Stefanick reinterviewed Carla and Stacy after telling them they had new information about the case, taking second statements from each of them.   A secretary employed by the prosecutor's office was present to type their statements.

After admitting she had lied in her first statement, Carla described the car ride from Newark to Rahway with [Petitioner], Jordan, and Peoples.   She also described the fighting at Capobianco Plaza and her subsequent meeting with [Petitioner].   Stacy also admitted he did not initially tell the complete truth because he was trying to protect family members, including [Petitioner], Jordan, and Peoples.   In his second statement, Stacy essentially corroborated his wife's revised version of events.   [Petitioner] was arrested on August 8, 2003.

On January 4, 2006, the judge entered a material witness order under the Material Witness Statute, N.J.S.A. 2C:104–3, and [N.J. Court] Rule 3:26–3(c) directing Carla to appear at a hearing. At the hearing on January 9, 2006, the judge found probable cause to believe she was a material witness and ordered her to appear for trial.   Between January 11 and 20, 2006, the case was tried before a judge and jury.

At trial, several witnesses gave testimony that was inconsistent with their prior written statements.   For example, Jordan denied hearing [Petitioner] say anything in the backseat of the Explorer during the trip to Rahway. He also did not remember seeing [Petitioner] standing near the victim during the fight. Instead, he testified he only saw his aunt and cousins fighting.

Carla also recanted portions of her second statement, claiming she did not hear [Petitioner] talking in the Explorer about a knife and did not see one in his hand.   She denied seeing [Petitioner] during the fight, or getting a call from him later that night asking if someone had died.

6

While Stacy recalled conversations in the car, he similarly testified at trial he never heard [Petitioner] mention a knife or say he was going to "shank someone." He also denied seeing any fighting by [Petitioner] or hearing any admission of guilt. During cross-examination, Stacy admitted he did not want to testify.

Unlike Jordan, Carla, and Stacy, Knight did not deny his prior statements but, instead, said he had been drinking and taking drugs and did not know if he was in the "right state of mind" when he gave his statement. Knight did not recall telling detectives he overheard [Petitioner] and Jordan talk about a fight or [Petitioner] say he stabbed "a guy" and hoped the individual did not die. [Petitioner] did not testify.

On January 20, 2006, the jury returned a verdict convicting defendant on all three counts [of the indictment, including first degree murder in violation of N.J.S.A. 2C:11-3 (count one), third degree possession of a weapon for an unlawful purpose in violation of N.J.S.A. 2C:39-4(d) (count two), and fourth degree unlawful possession of a weapon in violation of N.J.S.A. 2C:39-5(d) (count three)]. At sentencing on March 17, 2006, the judge merged count three (unlawful possession) into count two (possession for an unlawful purpose). The judge then sentenced defendant as follows: on count one, to sixty years in state prison with a thirty-year period of parole ineligibility, subject [to] an eighty-five percent [disqualifier pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2]; and on count two, to five years in prison with a thirty-month period of parole ineligibility. The judge ordered the sentences to run concurrently, and imposed various fines and penalties.

(Document 8 attached to ECF No. 13 at 1-12).

Although this factual recitation presents the bases for most of Petitioner's claims, there are a few additional facts regarding Petitioner's trial necessary for a full discussion of Petitioner's petition. One such area requiring further discussion is the jury selection at Petitioner's trial. During jury selection, when asked whether he knew Petitioner previously, one of the potential jurors stated that he had met Petitioner previously. (Document No. 20 attached to ECF No. 13 at 20-24). This occurred prior to the use of any challenges to sitting jurors by either Petitioner or

7

the state.  (*Id.*).   The following discussion resulted from this juror's response to the Court's question:

> THE COURT: All right.   [Juror].
>
> THE JUROR: Yes.
>
> THE COURT: Tell us what you do for a living.
>
> THE JUROR: Correction Officer.
>
> [The Court asked several follow up questions about his family, including the profession of his wife and children.]
>
> THE COURT: . . . I'm going to go by my recollection, you gave us quite a number of positive responses [to the Court's preliminary questions].   I'm going to go over them right now.   You told us that you answered question two, that you even know [Petitioner] or [his] family?
>
> THE JUROR: I've seen [Petitioner] before.
>
> THE COURT: You've seen [Petitioner] before?
>
> THE JUROR: Yes.
>
> THE COURT: Neighbor?   Same town?
>
> THE JUROR: Where I work.
>
> THE COURT: Where you work?   All right.   Sidebar, Please.
>
> [The Court continued at sidebar]:
>
> THE COURT: I'm going to excuse this juror without any further comments.   Any comments at this time counsel?
>
> [Defense Counsel]: No, Your Honor.   Normally I would have asked that the entire panel be stricken, but because of the fact that we anticipate [Petitioner] is going to take the stand, and there will be some reference to the fact that he served time before, it doesn't [a]ffect us negatively.

8

THE COURT: I'm going to continue to ask him his questions, but I will excuse him at the end.   It's just I'm doing it so I don't highlight the fact.

[Defense Counsel]: Okay.

[Sidebar concluded and the Court questioned the juror further regarding his having several family members engaged in law enforcement.]

THE COURT: Would [your relationship with numerous police officers in your family] interfere with your ability to be [a] fair and impartial juror?

THE JUROR: Somewhat.

THE COURT: Somewhat?   You don't think you could sit and listen to the evidence and decide this case based solely on the evidence?

THE JUROR: Yeah, I could, based on the evidence.

THE COURT: Okay.   You . . . think you['d] be more likely to believe a police officer?

THE JUROR: Yes.

THE COURT: Well, you know, [Juror], you've been involved in law enforcement long enough to know you can have a trial with one police officer testifying on behalf of the State, and [another] testifying on behalf of the defense saying completely opposite things.   How would you be able . . . to determine their credibility if [you're] just going to decide it on the basis –

THE JUROR: I guess on my job.

THE COURT: Same way you do everything?

THE JUROR: Yes.

THE COURT: You look at what's said, you compare it to what you know from your own experience, what other people say about it?

9

THE JUROR: Yes.

THE COURT: You look at the way in which you're being told, and then you look into a person's motive why they might be testifying?

THE JUROR: Yes.

THE COURT: [Juror], I'm going to excuse you as a juror in this case.

(Document 20 attached to ECF No. 13 at 24-28).   Jury selection thereafter continued, resulting in

the excusing of numerous jurors.

Before jury selection continued the following morning, the Court conducted the following

colloquy and then instructed the jurors still present to disregard the comment by the prospective

juror:

THE COURT: Okay.   We are on the record in the matter of [*State v. York*].   This is an in camera proceeding.

Counsel, in a discussion off the record, both [the] prosecutor and defense counsel were discussing something that happened yesterday during jury selection.

Juror number 4 . . . juror number 721, in response to [the] Court's question, indicated that he knew [Petitioner], and he knew him from work.   And earlier he had indicated that he was a corrections officer.

At sidebar [Defense Counsel] indicated that she intended to call [Petitioner] as a witness in the case, and, therefore, she waived any potential prejudice that could have occurred as a result of that comment.

Upon reflection, it is possible that the State's case does not go . . . that well, and we are now discussing how to proceed, whether a curative instruction is appropriate, or whether we should strike the panel and then start all over again.

[Defense Counsel], I gave you a proposed jury voir dire . . .

10

charge, and I'm going to try to repeat it now.   See if I can get your position on the record.

Ladies and gentlemen of the jury, there may have been some mention yesterday that a potential juror, who was a corrections officer, saw [Petitioner] at work.

I charge you now that individuals who are arrested for offenses, particularly serious offenses, are all booked through the jail.   And you are not to consider for any purposes in your deliberations whatsoever that [Petitioner] may have been in the jail at one time prior to this charge.

If the Court gave that instruction, what would your position be?

[Defense Counsel]: I think if the Court gives that instruction, with a couple of additional things, specifically narrowing it so that's reflected that when it's a serious charge, like the charges contained herein, and when you indicate that a person is brought there for booking and required to post bail, then I think that may resolve our issue, because [it] kind of gives them the impression that on a homicide charge you are booked, and at some point you have to post a bail, and you may be there for a couple of days until you post bail.

THE COURT: Prosecutor, what's your position?

[The Prosecutor]: I agree with that.   I think it cures the problem.

There was no discussion, I think it's important to note, there was no discussion on the record with the juror yesterday as to where he was a corrections officer.   I believe he was a State Corrections Officer.

THE COURT:   He works at Union County Jail.   He works at the jail right across the street.

[The Prosecutor]: He does? Oh, okay.

[Defense Counsel]: Yes.

[The Prosecutor]: I think my concern was that he was a New Jersey

Department of Corrections –

[Defense Counsel]: And you can –

[The Prosecutor]: – employee.

[Defense Counsel]: Safer to even state that . . . he works at Union County Jail.

[The Prosecutor]: I believe . . . that's the case, obviously, that would be the explanation for how he's seen [Petitioner] on prior occasions.

And it would, in light of the fact that [Defense Counsel] would anticipate his testimony, in light of the fact that it would be a logical explanation that jurors would be able to accept, I think it's something that would alleviate any problems.

THE COURT: All right.

[The Prosecutor]: Or any issues.

[Defense Counsel]: Judge, could we just be very careful not to say on previous occasions, but just to say that he had –

THE COURT: May have seen him at work.   That's what he said.

[Defense Counsel]: Right.

THE COURT: Is that okay?

[Defense Counsel]: Yes.

[The Court then called in the jury and gave them the following instruction]

THE COURT: Ladies and gentlemen, I apologize.   Please be seated.

I know many of you were here before 8:30, and it is close to 9:30 now.   So I, once again, I apologize, but some legal issues came up and we had to address them before we could even come out and speak to you.

12

Now, yesterday, during selection process, one of the jurors, one of the prospective jurors, who was ultimately excused, indicated that he was a corrections officer, and that he may have seen [Petitioner] at his work.

I charge you now that individuals who are charged with serious offenses, as this [Petitioner] faces, are required to be booked into jail, where bail is posted.   And that you are not to consider for any purposes that [Petitioner] may have been in the Union County Jail at some period of time.   All right?

Now I'm going to ask you, as part of my . . . instructions to you, and in voir dire questions, can everybody follow that instruction on the law?   And I'll see counsel at sidebar briefly.

(Sidebar).

THE COURT: Any comments?

[Defense Counsel]: No.   Just I thought you were going to go mention that [the juror] works specifically at Union County Jail . . .

THE COURT: Okay.

[Defense Counsel]: – other than that –

(End of sidebar).

THE COURT:   One additional point that came out yesterday was that . . . the prospective juror . . . was a Union County Jail Corrections Officer.   And if that was not made clear, I apologize to you.   But you are not to consider that for any purposes whatsoever.

(Document 3 attached to ECF No. 14 at 1-8).   Each juror then stated that he or she could and would follow that instruction, and jury selection continued.   (*Id.* at 8-10).

Because Petitioner also challenges the trial court's finding that one of the State's witnesses was competent to testify at trial, a brief recitation of the facts underlying that finding is necessary to provide context to Petitioner's claim.   The Appellate Division aptly summarized those

13

proceedings as follows:

At Carla's first appearance under the judge's material witness order on January 9, 2006, the judge found there was probable cause to believe she was a material witness based on a certification by the State she was in an automobile when [Petitioner] made certain inculpatory statements and was also present during the melee that occurred at Capobianco Plaza in July 2003.  The judge further found that, without some restrictions, Carla would not appear to testify on behalf of the State against [Petitioner], who was her brother.  The judge was also concerned for Carla's health, after considering her husband's statements to the prosecutor about her prior suicide attempt and Carla's admission she previously was diagnosed with depression and had taken Risperdal® and Zoloft®. The judge, therefore, ordered Carla to remain in the custody of the prosecutor's office, which he directed to take her "with all deliberate speed to the nearest mental health institution, where she can be evaluated with respect to those mental health issues, and [determine] whether she might be suicidal at that point in time."

Carla was admitted that day to Trinitas Hospital, given three anti-depressant medications, and discharged the next morning to the prosecutor's office.  At the follow-up hearing on January 10, 2006, the State advised the judge the hospital had issued a brief discharge summary, stating Carla was medicated with Xanax®, Risperdal®, and Zoloft®, and was referred to the Outpatient Unit.  The judge then found, by clear and convincing evidence, that Carla was a material witness in the case and some restrictions were necessary to ensure her appearance at trial.  Specifically, he released Carla to the custody of her husband as long as she reported on a daily basis to Trinitas Outpatient Clinic and took the prescribed medicines.  Carla told the judge she understood the conditions of her release and acknowledged the judge would issue a bench warrant for her arrest if she did not appear in court.  When asked if the judge needed to place any other restrictions on Carla, the assistant prosecutor and defense counsel said, "I don't believe so," and "I don't think so," respectively.

One week later, Carla appeared in court to testify at trial. She acknowledged undergoing medical treatment for depression and suicide and indicated she understood what it meant to tell the truth. Without having her recollection refreshed, Carla said her sister lived in Rahway and, in July 2003, she also lived there, but did not know

where her father lived.   She remembered the names of her husband and children, the fact that her family owned a white Explorer with license plate NWN–39B, and the constant harassment of her children by the Williams family.   Carla also recalled attending a family reunion in Newark on the night of July 19, 2003, and receiving a telephone call after it ended.   While answering questions, she said, "I'm tired."

When Carla could not recall the date she moved into Capobianco Plaza, defense counsel objected and at sidebar questioned her competency to testify.   Defense counsel observed Carla appeared confused and "under the influence of some type of narcotics or some type of drug or medication."   The judge overruled the objection, finding Carla had "been responsive to the extent that . . . she's able to remember."   Defense counsel then asked the judge to voir dire Carla outside the jury's presence to determine her competency.   The judge denied the request.

After the State resumed its direct examination, Carla acknowledged she moved into Capobianco Plaza in November 2002.   Shortly afterwards, Carla said the medicine made her "very sleepy."   When asked if the medicine affected her ability to tell the truth, she replied, "It's hard to remember."   After further questioning, the judge excused the jury for a lunch break and conducted a [hearing pursuant to *State v. Gross*, 216 N.J. Super. 98 (App. Div. 1987), *aff'd*, 121 N.J. 1 (1990), to determine the admissibility of Carla's prior inconsistent statements] outside its presence.

At the *Gross* hearing, Carla could not remember several of the questions and answers in her two prior statements.   When the judge asked if she understood "the process," Carla replied, "Not really. I—everything is getting confusing to me. I hear what he's saying, but I can't register it up here like I want to. Oh, God.  My head is so heavy from this medication. . . . And my eyes is [sic] heavy, and I feel very sleepy."   Defense counsel renewed her objection, which the judge noted.

At the conclusion of the *Gross* hearing, the State resumed its direct examination during which Carla testified she did not remember her first sworn statement.   On cross-examination, however, Carla explained she had lied in her first statement and the detectives did not include everything she said in the second

15

statement:

> They didn't want to hear it. Basically they were
> telling me we know what's going on. We talked to
> [Jordan], and we talked to [Peoples]. And we—we
> are going to haul your ass to jail. That stuck with
> me, they were going to haul my ass to jail and kids
> taken [sic] from me. Who's going to take care of our
> 5 kids?

(Document 8 attached to ECF No. 13 at 13-17). Based on her testimony at trial, the trial court

rejected Petitioner's claim that Carla was incompetent to act as a witness, and the Appellate

Division ultimately found that the trial court did not abuse its discretion in so finding without

holding a hearing on the issue. (*Id.* at 17-18).

Following his conviction, Petitioner filed a direct appeal to the Superior Court of New

Jersey, Appellate Division. (Document 8 attached to ECF No. 13). The Appellate Division

affirmed Petitioner's conviction and sentence by way of an unpublished opinion issued on July 29,

2009. (*Id.*). Petitioner thereafter filed a petition for certification with the New Jersey Supreme

Court, which was denied on December 3, 2009. (Document 11 attached to ECF No. 13).

Following the conclusion of his direct appeal, Petitioner timely filed a petition for post-

conviction relief (PCR). (*See* Document 15 attached to ECF No. 15). The trial court denied that

PCR petition following oral argument without holding an evidentiary hearing on June 3, 2011.

(*Id.*). Petitioner appealed, but the Appellate Division affirmed the denial of his PCR petition on

April 29, 2013. (Document 14 attached to ECF No. 13). Petitioner once again filed a petition

for certification with the New Jersey Supreme Court, which was ultimately denied on October 25,

2013. (Document 17 attached to ECF No. 13). Petitioner thereafter filed his current habeas

petition.

16

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts

17

due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B. Analysis

### 1. Exhaustion

Respondents argue that several of Petitioner's ineffective assistance of counsel claims were never presented to the New Jersey appellate courts, and that Petitioner's current habeas petition must therefore be dismissed because it is an unexhausted mixed petition. In his reply brief, Petitioner acknowledges that several of his ineffective assistance claims, though presented to the PCR trial court, were never presented on appeal. Although Petitioner acknowledges that his petition is therefore not fully exhausted, he argues that the failure to raise those claims on appeal was the fault of his PCR appellate counsel, and that he should therefore not be penalized for the failure to raise those claims.

Pursuant to 28 U.S.C. § 2254(b)(1), a habeas petition challenging a state court conviction "shall not be granted unless it appears that" the petitioner has exhausted all of his claims by presenting them to the highest available state court, unless no state court process is available or circumstances exist that render the available state court process ineffective to protect the petitioner's rights. While the statute thus in most cases prevents this Court from granting relief on any unexhausted claims, § 2254(b)(2) provides that a district court may deny a claim on the

merits "notwithstanding the failure of the applicant to exhaust" his claims in state court. Thus, the Court may deny a claim not presented to the state courts where that claim is without merit. Where a habeas petition presents a mix of exhausted and unexhausted claims, the district court thus has four options: "(1) dismiss the petition without prejudice; (2) stay the proceedings and hold them in abeyance until the claims are exhausted; (3) allow [Petitioner] to delete his unexhausted claims; and (4) deny the petition if it found all of [Petitioner's] unexhausted claims to be meritless under § 2254(b)(2)." *Mallory v. Bickell*, 563 F. App'x 212, 215 (3d Cir. 2014) (citing *Rhines v. Weber*, 544 U.S. 269, 274-78 (2005)).

Here, Petitioner has presented no evidence to suggest that there was no state court process available to him nor that the available process was ineffective to protect his rights, and as such he is bound by the exhaustion requirements of the habeas statute. As Petitioner's petition contains both exhausted and unexhausted claims, because Petitioner has specifically not requested a stay as he acknowledges that his claims would be denied as time barred if he attempted to now raise them in the state appellate courts, and because Petitioner at no time sought the withdrawal of his unexhausted claims, this Court is presented with two options – dismiss the petition without prejudice, or deny Petitioner's unexhausted claims if they are without merit. *Mallory*, 563 F. App'x at 215. Because this Court finds, for the reasons expressed below, that all of Petitioner's claims are without merit, this Court will deny the petition on the merits despite Petitioner's failure to exhaust. *Id.*

## 2. Petitioner's Jury Selection Claim

In his first claim, Petitioner asserts that he was denied a fair trial when, during jury

selection, a prospective juror admitted to having seen Petitioner before during his work as a corrections officer in the Union County Jail.   Essentially, Petitioner attempts to assert that a single comment by this prospective juror, that he knew Petitioner from his work as a corrections officer in the county jail, denied him Due Process in so much as the jury panel was essentially "poisoned" by this comment.   Before turning to the merits of the claim itself, the Court must note that Petitioner's claim, even if it had merit, would be subject to rejection because his trial counsel specifically chose not to request the dismissal of the entire jury panel and chose to proceed with the curative instruction provided by the trial court.   Thus, to the extent that Petitioner's claim that the trial court erred has merit, that claim is subject to rejection under the invited error doctrine. *See, e.g., United States v. Maury*, 695 F.3d 227, 256-57 (3d Cir. 2012) (invited error doctrine prevents a petitioner from raising a claim challenging an action of the trial court that he invited or induced through his own actions unless the law that led him to invite that error has since been rendered constitutionally infirm).   Because counsel agreed with the jury instruction provided by the trial court and specifically rejected the need to dismiss the entire jury panel, Petitioner cannot now claim that those actions were not in his best interests.

In any event, even if Petitioner's claim were not barred by the invited error doctrine, it is clear that, to the extent that the actions of the trial court were erroneous, this particular occurrence was, in light of the jury instruction provided by the court, harmless.   On collateral review, an alleged error, constitutional or otherwise, is considered "harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'"   *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)).   Thus, unless a petitioner can show that an alleged error had such a substantial and injurious effect, and therefore prejudiced his

defense, his claims do not entitle him to collateral relief.

In this case, it is clear that the error alleged had no substantial and injurious effect on the jury's verdict.   The record makes it abundantly clear that the potential juror made only a brief comment on knowing Petitioner from his work, a comment which was separated from his stating that he was a corrections officer at the county jail by several intermediary questions.   The trial court then immediately consulted the parties, who agreed that the jury panel need not be dismissed because of the fleeting comment.   The trial court then went through numerous other questions in order to draw no attention to the challenged statement, and ultimately dismissed that juror.   The trial court thereafter gave a thorough instruction to all of the jurors who had been present for that statement and who remained among the potential jurors to ensure that they knew that they could not consider that statement for any reason, an instruction to which defense counsel agreed.   In that instruction, the court not only instructed the jury not to consider the statement, but also undercut any potential prejudice by specifically informing those jurors who heard the original comment that many who are charged with serious offenses pass through the jail before receiving bail.   Given these instructions, and the jurors' affirmance that they could follow the instruction and disregard the comment, it appears that no prejudice could have resulted.   The trial court tailored a sound instruction that directly limited any potential inference that Petitioner had a criminal history, while also preventing the statement from receiving undo attention.   Petitioner has presented no real argument or basis for any inference that this single comment somehow irreparably poisoned the jury pool.   Thus, Petitioner's claim must fail because any error that may have occurred was harmless, as there is no evidence to suggest that Petitioner suffered any substantial and injurious effect from the juror's comment in light of the trial court's careful curative instruction.   Thus,

Petitioner's contention that he is entitled to habeas relief on this ground is without merit.

### 3. Petitioner's Witness Competency Claim

Petitioner next asserts that his sister, based on her mental state and medication, was not competent to act as a witness at his trial and that the trial court erred in denying his lawyer's request to have her declared incompetent without a hearing on the issue.   Petitioner is therefore essentially challenging the trial court's determination that her testimony was admissible at trial based on her mental competency.   Because federal habeas relief is not available based on violations of state law, and because a state's evidence rules generally govern the admission of evidence or testimony in a given state criminal trial, an allegedly erroneous evidentiary ruling by a state court is insufficient to warrant habeas relief unless the error in question rose to the level of a Due Process violation.   *See Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991); *see also Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009); *Keller v. Larkins*, 251 F.3d 408, 413, 416 n.2 (3d Cir.), *cert. denied*, 534 U.S. 873 (2001).   A state evidentiary ruling will only rise to that level where the error in question was so grave or pervasive that it in effect denied the petitioner a fundamentally fair trial.   *Keller*, 251 F.3d at 413.   Having reviewed the trial court's actions with regard to permitting Petitioner's sister to testify, it is clear that that decision did not deny Petitioner a fair trial.

Under the New Jersey rules of evidence, as under their federal analogue, *see Gov't of Virgin Islands v. Joseph*, 162 F. App'x 175, 176 (3d Cir. 2006), witnesses are presumed to be competent to testify.   *See State v. Krivacska*, 341 N.J. Super. 1, 33-36 (App. Div.), *certif. denied*, 170 N.J. 206 (2001).   Where the competency of a non-defendant witness is challenged, a decision as to

22

that competency is left to the sound discretion of the trial court judge, and "disqualification is the exception to the general rule of witness competency." *Id.* at 36 (quoting *State v. Scherzer*, 301 N.J. Super. 363, 463 (App. Div.), *certif. denied*, 151 N.J. 466 (1997)).  Under the New Jersey rules, a witness is generally not competent only where the judge finds that the witness is incapable of being understood by the jury, is incapable of understanding his duty to tell the truth, or is incapable of understanding and intelligently answering the questions posed.  *Id.*; *see also State v. Davis*, 229 N.J. Super. 66, 77-78 (App. Div. 1988).

In this case, it is clear that the witness in question was capable of testifying in a manner that could be understood by a jury, and understood her responsibility to tell the truth.   Although Petitioner's sister may have been depressed and medicated while on the stand, she was clearly able to understand the questions posed to her, was able to answer those questions where she could remember what had happened, and indeed was able to explain the discrepancies between her various statements even to the extent of claiming that the police had modified or excised context from those statements.  (*See* Document 8 attached to ECF No. 13 at 13-17).   There does not appear to be any basis in the record for any assertion that she did not understand the requirement that she tell the truth, that she was incapable of understanding the questions posed or to respond to them intelligently, or that she could not be understood.   Thus, nothing in the record suggests that Petitioner's sister was incompetent to testify under the New Jersey evidentiary rules, her medication and mental state notwithstanding.   Because it appears that she was competent to testify, the trial court's decision to permit her to testify clearly did not render Petitioner's trial fundamentally unfair, and that decision therefore did not deny Petitioner due process.  *Keller*, 251 F.3d at 413.   As such, Petitioner is not entitled to habeas relief on his witness competency claim.

23

### 4. Petitioner's Sentencing Claim

Petitioner next claims that his sentence violated the rule set forth in *Blakely v. Washington*, 542 U.S. 296 (2004), because he was sentenced to a term above the statutory presumptive term based on judicial fact-finding.   In *Blakely*, the Supreme Court held that a sentencing statute's presumptive or standard range would constitute the statutory maximum for the purposes of applying the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (requiring any fact that would enhance a sentence beyond the statutory maximum to be found beyond a reasonable doubt by a jury).   542 U.S. at 299-304.   As such, the Court held that any fact that would increase a given defendant's sentence beyond the standard or presumptive statutory sentencing range must be found by a jury rather than by a judge.   *Id.*

Here, Petitioner asserts that the presumptive term for murder is thirty years, and that the trial judge's decision to give him a sentence beyond thirty years based on the applicable sentencing factors amounted to a sentence beyond the presumptive term requiring jury, rather than judicial, fact-finding.   The inherent flaw in this argument, as explained in the Appellate Division's opinion on direct appeal, is that the "standard range for [a] murder [conviction in New Jersey] is a sentence between thirty years and life imprisonment."   (Document 8 attached to ECF No. 13, quoting *State v. Abdullah*, 184 N.J. 497, 507 (2005)).   Likewise, as the Appellate Division explained, "murder has always been exempt from the presumptive-term provisions of [New Jersey's] sentencing scheme."   (*Id.*).   Thus, it is clear that there is no presumptive or standard sentencing term for a murder conviction in New Jersey, and the maximum sentence for murder is life imprisonment.   Thus, any sentence up to and including life imprisonment is within the standard statutory

24

sentencing range, and any sentence up to and including life imprisonment on the basis of judicial

fact-finding under the sentencing factors for a New Jersey murder conviction would not violate

the *Blakely* or *Apprendi* rules as no additional fact-finding beyond the murder conviction is

necessary for a life sentence. (*Id.*).  *See also Abdullah*, 184 N.J. at 507.   Petitioner's contention

that he was sentenced above the standard or presumptive term for murder is thus utterly devoid of

merit, and his sentence in no way violated *Blakely*.   Petitioner is thus not entitled to habeas relief

on this ground.


### 5.  Petitioner's Jury Instruction Claim

In his next claim, Petitioner asserts that the trial court erred in charging the jury in so much

as the jury charge discussed the State's witnesses but not Petitioner's.  "[T]he fact that [an]

instruction was allegedly incorrect under state law is not a basis for habeas relief."   *Duncan v.

Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert.

denied*, 534 U.S. 919 (2001).   Where a petitioner raises a challenge to a state court instruction,

habeas relief will only be warranted where "the ailing instruction by itself so infected the entire

trial that the resulting conviction violates due process."   *Id.* (quoting *Henderson v. Kibbe*, 431

U.S. 145, 154 (1977)).   That the challenged jury charge is "undesirable, erroneous, or even

universally condemned" in and of itself is insufficient to warrant relief, and a reviewing court must

review the challenged charge in the context of the overall jury charge to determine whether the

charge was so erroneous that it resulted in a violation of due process.   *Id.*

Here, Petitioner contends that the trial court's jury charge denied him due process because

the trial judge summarized the testimony of various witnesses for the State, but did not recount the

testimony of his own witness.   Specifically, Petitioner takes issue with the following portion of

the jury charge:

> Once again, I'm going to be talking about the evidence as I recall it being presented.   You should not . . . you are the trier of the fact[s].   If what I say differs from . . . your recollection, it's your recollection of the evidence that controls and I'm just going through the evidence to assist you in relating it to this charge of identification.

> Now, Anthony Johnson, Carla Todd, Stacy Todd, and Jamal Pe[o]ples all identified [Petitioner] in Court as someone that they knew before this incident and who went with them to Capobianco Plaza on the night that Jamil Swint was stabbed.   In court Anthony Jordan, Carla Todd and Stacy Todd denied hearing or seeing [Petitioner] do or say anything that implicated [Petitioner] in the death of Jamil Swint.   They all gave statements on prior occasions and in at least one of those statements they told the police that [Petitioner] had said or did something from which the State is asking you to infer that [Petitioner] stabbed Jamil Swint.

> Jamal Pe[o]ples testified that he may have seen [Petitioner] with a knife in his hand during the incident.   He testified that that observation of that glimpse was made from approximately 54 feet away and that something that he . . . something shiny that he saw in his hands and I believe there was even some examination by [Defense Counsel] and he acknowledged that it could have been a piece of bubble gum foil[.]

> Now, Corel Williams testified that she identified a photograph of an individual who stabbed Jamil Swint.   There is evidence in the case, and in fact, the last witness gave positive evidence that there was a photograph of [Petitioner] in one of the arrays that was shown to Ms. Williams and she . . . there is evidence in the case that the photograph she identified was a photograph of [Petitioner].   She was not, however, able to identify [Petitioner] in court as the person who stabbed Jamil Swint.

> [Manuel] Johnson testified in court that he saw [Petitioner] stab Jamil Swint.   And you will recall that this witness identified [Petitioner] in court as the person who committed the stabbing. There was also . . . testimony that on a prior occasion before this

26

trial, this witness was not able to identify [Petitioner] in a . . . photo array and that there was a picture of [Petitioner] in the array. According to the witness his identification of [Petitioner] in court was based upon the observations and perceptions he made of the perpetrator at the time the crime was being committed.

It is your function to determine whether, from all of these witnesses' identification[s], whether these witnesses' identifications of [Petitioner] are reliable and believable or whether they are based on a mistake or for any reason not worthy of belief.

Now Bernard [Sasser], Michael York, and Ang[u]el Knight testified that they were related to each other and that they were all acquainted with [Petitioner].   And the State presented evidence, and on prior occasions they gave statements to the police in which they said they heard or saw [Petitioner] do or say something that implicated him in the stabbing of Jamil Swint.

On the witness stand all of these witnesses deny that they saw or heard [Petitioner] do or say anything that was inculpatory, except that Ang[u]el Knight testified that he overheard [Petitioner] on a cell phone talking about an individual who had been stabbed. And that when he was given this information . . . that this individual was not dead that [Petitioner] appeared to be happy.   His statement also reflects that he heard [Petitioner] admitting to stabbing someone.

You must decide whether the identification[s] here are sufficiently reliable evidence . . . for you to conclude that this [Petitioner] is the person who committed the offenses charged.   In evaluating these identifications . . . you should consider the observations and the perceptions on which the identifications were based and the witnesses' ability to make those observations and . . . perceptions.

If you determine that the out-of-court identification is not reliable, you may still consider the witnesses in-court identification of [Petitioner] if you find it to be reliable.   However, unless the in-court identification of [Petitioner] resulted from the witnesses observations or perceptions of the perpetrator at the time . . . in question rather than being the product of an impression gained at the out-of-court identification procedure, it should be afforded no[] weight.   The ultimate issues of the trustworthiness of both the in-

court and out-of-court identifications are for you, the jury, to decide.

To decide whether the identification testimony is sufficiently reliable evidence upon which . . . you [can] conclude that this [Petitioner] is the person who committed the offenses charged, you should evaluate the testimony of the witnesses in light of the factors for considering credibility that I have already explained to you.

You may also consider the following factors. The witnesses' opportunity to observe the person who committed the offense at the time of the offense[, t]he witnesses' degree of attention on the perpetrator when he or she observed the crime being committed[, t]he accuracy of any description the witness may have given in identifying the perpetrator[, t]he degree of certainty expressed by the witness in making the identification[, t]he length of time between the witnesses' observation of the offense and the first identification[, d]iscrepancies or inconsistencies between the identifications[] if any[, and t]he circumstances under which the out-of-court identification was made. And here, for example, Corel Williams testified that her identification was made while she was in a hospital bed.

You may also consider any other factor based on the evidence or lack of evidence in the case which you consider relevant to your determination whether the identifications were reliable.

Now with respect to the testimony of Anthony Jordan, Carla Todd, Stacy Todd, Michael York, Bernard [S]asser, and Ang[u]el Knight, remember, to the extent that their testimony identifies [Petitioner] as being complicit in the stabbing of Jamil Swint that evidence comes, for the most part, in the form of prior statements that they gave to the police. And in that regard you should consider my prior instructions to you relating how you may use those statements.

(Document 3 attached to ECF No. 13 at 23-24, Document 4 attached to ECF No. 13 at 1).

Placed in its proper context, it is clear that the reason the Court mentioned many of the

State's witnesses but did not mention Petitioner's witness in this section of the jury charge is that

Petitioner's witness never made an identification of the perpetrator. Thus, there was no reason

28

for the trial court to discuss her lack of an identification in setting forth the standards for determining the reliability of the out of court identifications of Petitioner.   It is also clear that the Court's charge gave fair and equal treatment to both the prior inconsistent statements identifying Petitioner as the perpetrator and the in court testimony denying that Petitioner was involved in the stabbing of Swint.   The Court merely summarized the testimony of these witnesses to provide a proper context for the evaluation of his jury charge as to identifications, and reference to a witness who did not make an identification, and indeed provided testimony whose central value to Petitioner was her failure to identify him as the perpetrator, was not necessary or relevant to that purpose.   Nothing in the jury charge suggests the bias or unfairness Petitioner asserts, and nothing in the charge suggests any attempt by the Court to force its view of the evidence on the jury.   Quite to the contrary, the charge indicates that the trial judge sought to make it clear that it was the jury, and not the trial court, who was to interpret and judge the facts, including the reliability of any and all identifications.   Having considered the challenged section of the jury charge in light of the charge as a whole and in its proper context, it is clear that the charge in this matter did not "so infect[] the entire trial that the resulting conviction violate[d] due process," and Petitioner is therefore not entitled to habeas relief on this basis.   *Duncan*, 256 F.3d at 203.   Petitioner's contention that the charge was somehow biased or unfair is not supported on this record, and his claim is therefore without merit.

### 6.  Petitioner's Ineffective Assistance of Counsel Claims

All of Petitioner's remaining claims assert that his trial counsel was constitutionally

29

ineffective for a variety of reasons.   The standard applicable to ineffective assistance of counsel claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).   To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.   This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).   A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances.   *Id.*   The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel.   *Id.*   In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense.   *Id.* at 692-93.   "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.   The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299.   Where a "petition contains no factual matter regarding

> *Strickland's* prejudice prong, and [only provides] . . . unadorned
> legal conclusion[s] . . . without supporting factual allegations," that
> petition is insufficient to warrant an evidentiary hearing, and the
> petitioner has not shown his entitlement to habeas relief.   *See*
> *Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010).   "Because
> failure to satisfy either prong defeats an ineffective assistance claim,
> and because it is preferable to avoid passing judgment on counsel's
> performance when possible, [*Strickland*, 466 U.S. at 697-98],"
> courts should address the prejudice prong first where it is dispositive
> of a petitioner's claims.   *United States v. Cross*, 308 F.3d 308, 315
> (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Turning first to Petitioner's claim that his trial counsel was ineffective in so much as she failed to demand the dismissal of the jury panel following the statement by a potential juror suggesting Petitioner had at some point been in the county jail, that claim must fail for substantially the same reason that Petitioner's substantive claim failed – Petitioner has not shown that he suffered any prejudice as a result of this incident.   Petitioner has essentially provided no facts that would support the conclusion that this incident resulted in any prejudice to him, or to suggest that the outcome of his criminal proceedings would have been in any way different had counsel insisted that the jury panel be dismissed and a new jury selected following that incident.   As previously discussed, given the carefully crafted jury instruction provided to the sitting jurors by the trial court, it does not appear that Petitioner could have suffered any prejudice as a result of the prospective juror's statement.   Thus, as Petitioner has not shown even a prima facie claim for prejudice as to this claim, he has failed to establish that his trial attorney was constitutionally ineffective, and Petitioner's jury-taint related ineffective assistance claim therefore provides no basis for habeas relief.   *Shedrick*, 493 F.3d at 299; *Judge*, 119 F. Supp. 3d at 280-81.

Petitioner next asserts that both trial and appellate counsel proved ineffective by failing to object to the identification of Petitioner by several witnesses, arguing that those identifications were unreliable and therefore subject to challenge.   To show that he was prejudiced by counsel's alleged failure to challenge the in court identifications, Petitioner "must show that he would likely have prevailed on [a] suppression motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted." *Thomas v. Varner*, 428 F.3d 491, 502 (3d Cir. 2005).   The standard governing the admissibility of an identification was established by the Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).   Under *Manson*, an identification procedure violates due process and the resulting identification is therefore inadmissible where the procedure used by the police or prosecutor was "unnecessarily suggestive and . . . create[d] a substantial risk of misidentification." *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006); *see also United States v. Anthony*, 458 F. App'x 215, 218 (3d Cir. 2012). Although reliability is "the linchpin in determining the admissibility of identification testimony," *Manson*, 432 U.S. at 114, the question of whether an identification is reliable arises only where the procedures used to procure that identification were themselves suggestive. *Id.* at 107-14; *see also State v. Henderson*, 208 N.J. 208, 219-220 (2011) (under New Jersey law in effect at the time of Petitioner's trial and direct appeal, a criminal defendant was required to make a threshold showing of suggestiveness before he was entitled to a hearing on the reliability of a challenged identification).[1]

_____

[1] Although the New Jersey Supreme Court, beginning with *Henderson*, has to some extent refined the approach to the application of the *Manson* standard, *Henderson* makes it clear that, at the time of Petitioner's trial and direct appeal, the New Jersey courts required evidence of suggestive procedures before providing a hearing on, let alone granting, a motion to suppress identification

Here, Petitioner asserts that his trial counsel was ineffective in that she did not move for the exclusion of the eyewitness identifications of K.W., Manuel Johnson, and Monique Williams. In support of this argument, Petitioner argues at length that the statements were unreliable because of a lack of familiarity, the fact that the identifications became stronger after the initial identification, and the like. The inherent problem with Petitioner's arguments, as recognized by the State courts, is that Petitioner has failed to identify any way in which the procedures used by the police were themselves suggestive. Under the case law applicable at the time of Petitioner's trial, evidence of suggestiveness was a requirement for receiving a hearing on the admissibility of an out-of-court identification. *See Henderson*, 208 N.J. at 219-20. As neither Petitioner's PCR counsel's brief nor Petitioner himself in this matter have identified how the conduct of the police in this matter was suggestive, Petitioner has failed to present a prima facie basis for the trial court to have held a hearing on this issue prior to trial. As Petitioner has therefore failed to show that he would have been entitled to a pre-trial hearing on the admissibility of the identifications, he has in turn failed to show that he was in any way prejudiced by counsel's failure to object to the identifications and failure to request a hearing on that issue. *Thomas*, 428 F.3d at 502. As Petitioner has therefore failed to show that he was prejudiced, his claim of ineffective assistance of counsel must in turn fail. *Id.* It is thus clear that Petitioner's contention that his trial and appellate counsel were ineffective in failing to raise this point before trial and on direct appeal is without merit, and that Petitioner is not entitled to habeas relief. Likewise, because Petitioner has

---

testimony, and that any changes made to the application of the standard in *Henderson* applied prospectively only. *Henderson*, 208 N.J. at 219-220. Although *Henderson* changed how New Jersey courts applied *Manson*, even under *Henderson* it is only when "defendants can show some evidence of suggestiveness" that a pretrial hearing is necessary. *Id.* at 219.

failed to show a prima facie case of ineffective assistance of counsel, his contention that the state courts erred in denying him an evidentiary hearing on his ineffective assistance claims is likewise without merit.   *See State v. Precise*, 129 N.J. 451, 462 (1992) (petitioner must make prima facie showing of ineffective assistance of counsel to be entitled to an evidentiary hearing); *accord Palmer v. Hendricks*, 592 F.3d 386, 395-400 (3d Cir. 2010).   Because all of Petitioner's claims are thus meritless, this Court will deny Petitioner's habeas petition.

## III.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented here are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because jurists of reason could not disagree with this Court's conclusion that Petitioner's claims are without merit, Petitioner's habeas petition is inadequate to deserve encouragement to proceed further.   As such, this Court will deny Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED and Petitioner is DENIED a certificate of appealability.   An appropriate order follows.

 

 

**JOSE L. LINARES**
United States District Judge

Dated:   October _____11_____ , 2016